## TUMLINSON VS. SWINNEY.

A homestead, under the statute, is the place of a house or home—that part of man's landed property which is about and contiguous to his dwelling house.

A residence once in good faith established, draws around it the protection of the homestead law; and a temporary residence on another place, for purposes of business, will not oust this right, unless the design of permanent abandonment be apparent.

A party having residences on separate tracts of land, both levied upon, may, unless he has previously made his election, even on the day of sale, elect which of the two places he recognizes as his homestead, and the election then made will suffice to withdraw the place designated from sale, to the extent authorized by the statute.

WILLIAMS & MARTIN, for appellant.

The "residence" of a defendant, to entitle him to the benefit of a homestead exemption from execution, must, under the statute, be a bona fide actual residence. The purpose of the act

is to exempt from sale that place of residence which is the real home place of the debtor. *Gould's Dig. Ch.* 68, *Sec.* 29.

The residence, to exempt, must attach in apt time, before a levy made under an execution. *Analogous cases,* 18 *Ala.* 127; 14 *Ark.* 57; 15 *Ib.* 272; 18 *Ib.* 419.

JORDAN for appellee.

A party may have two residences within the purview of the statute, and is privileged to select either for a homestead—it is sufficient to make this election at any time before actual sale·

Mr. Chief Justice ENGLISH delivered the opinion of the court.

Tumlinson brought ejectment against Swinney, for the N. E. quarter of section 29, and the south half of the S. E. quarter of section 20, in T. 3 N. R. 29 W., Scott county.

On the trial before the court, sitting as a jury, the following evidence was introduced :

On the 16th of January 1855, Swinney gave his bond to Joseph J. Tumlinson for $2,961 50 with interest at 10 per cent.

On the 3d of March, 1858, Olivia Tumlinson, executrix of Joseph J. Tumlinson, obtained a judgment against Swinney, in the Scott circuit court, for the amount of the bond.

On the 19th of March, 1858, an execution issued on the judgment, which, on the 25th of the same month, was levied on the lands above described, together with two other tracts, (S. E. ¼ of S. E. ¼ section 6, and S. W. ¼ of S. W. ¼ section 5, T. 4 N., R. 30 W.,) on which last named tracts there was situated a steam mill. The lands were all sold by the sheriff, on the 20th August, 1858, and the tracts sued for purchased by Vandever, who took the sheriff's deed therefor, and afterwards, and before the commencement of this suit, conveyed them to Wiley A. Tumlinson, the plaintiff.

The return of the sheriff shows that when he offered the lands for sale, Swinney claimed as his homestead :

The E. ½ of the N. E. ¼ section 29.

The N. W. ¼ of the N. E. ¼ section 29.

The S. E. ¼ of the S. E. ¼ of section 20, and two acres in the N. E. corner of S. W. ¼ of S. E. ¼ of section 20—all in T. 3 N., R. 29 W.—and that the lands were offered for sale, and sold subject to the homestead claim, provided Swinney had any.

A witness for plaintiff testified that defendant was in possession of the lands described in the declaration, at the time the suit was commenced—(28th June, 1859.)

A witness for defendant stated that he, defendant, had resided on the lands for several years, until a year or two before the sale, when he purchased a tract of land and mill, some seventeen miles distant, and then moved to the mill. That witness rented the land in dispute under an agreement that he was to hold possession until the defendant might want it, and whenever he desired it, the witness was to surrender possession. At the time he took possession, defendant charged him to take good care of the fence, as it was his *homestead*. A few days before the sale defendant moved a part of his furniture and his wife from the mill, and occupied one room in the house on the lands, until a short time after the sale, when he returned to the mill with his wife, and they remained there for some months. That he did not take the furniture back to the mill with him. That after he returned to the mill, the room occupied by him and wife at the time of the sale, was occupied by a young man in his employment.

The defendant also proved, by the sheriff, that on the day of sale he claimed a *homestead* of 160 acres, a part of the lands in the declaration mentioned, and that the whole of the lands were sold subject to his *homestead*, if he had any, which was announced at the time of the sale.

The plaintiff then introduced a witness, who stated that when defendant purchased the land on which the mill was situated, he moved to the mill, and resided there one or two years. That a few days before the sale of the lands described in the declaration, by the sheriff, he brought his wife to the place, and remained there until a few days after the sale, and then returned to the mill, with his wife, and remained there for two or three

months, for the purpose of settling up his business, when he returned to the premises mentioned in the declaration. That on the day of sale, the defendant claimed a homestead on the lands in question, or on the mill property, and said he was entitled to a homestead on one of the places and would have it. That at the time of the levy he was residing at the mill.

Which was all the evidence introduced by the parties.

The court, sitting as a jury, found that the defendant was entitled to a *homestead* of 160 acres, out of the lands described in the declaration, composed of the portions of the land designated by him as his homestead on the day of sale, and described as above in the sheriff's return; and that the plaintiff was entitled to the remainder of the lands, and judgment was rendered accordingly.

The plaintiff moved for a new trial, on the grounds that the finding of the court was contrary to law and evidence; the motion was overruled, and he excepted, and appealed.

The first section of the homestead act (*Gould's Dig. Ch.* 68, *Sec.* 29,) provides that :

"Every free white citizen of this State, male or female, being a householder, or the head of a family, shall be entitled to a homestead, exempt from sale or execution (except as hereafter mentioned) not exceeding one hundred and sixty acres of land, or one town or city lot, being the residence of such householder or head of a family, with the appurtenances and improvements thereunto belonging."

By the second section, the homestead is exempt from execution, etc·, during the time it shall be occupied by the widow, child or children of any deceased person who was, when living, entitled to the benefit of the act.

The *homestead* is the place of a home or house. That part of a man's landed property which is about and contiguous to his dwelling house. Called anciently a *homestall or homestale*. 2 *Bouv. L. Dic.*; 1 *Bouv. L. Dic.*; 2 *Met. R.* 45, *note.*

*Mr. Ch. J. Hemphill*, remarking on the homestead law of Texas, in *Franklin vs. Coffee*, 18 *Texas,* 415, said : " A homestead

necessarily includes the idea of a house for residence or mansion house. On town or city lots, it cannot exceed a certain value. But on the rural homestead there is no restriction. The dwelling may be a splendid mansion, or a mere cabin or tent, open to the winds and rains of heaven. If there be either, it is under the protection of the law, but there must be a home residence before the two hundred adjoining acres can be claimed as a homestead."

It is clearly intended by our statute, that the homestead is to be the *home*, the place of *residence*, of the party claiming the benefit of the act. The legislature intended to secure to the householder, or head of a family, a *home*, a *dwelling place*, free from the claims of creditors, and protected from the invasion of officers of the law—an asylum, where the family may live in independence and security, and which they may improve and make comfortable, without the fear of being deprived of it, and turned houseless and homeless upon the world, by improvidence, or by the misfortunes and vicissitudes incident to life.

In the case of *Franklin vs. Coffee*, above cited, Mr. Chief Justice Hemphill also said :

" Where a home, residence, or settlement has once been acquired on lands, it would not be necessary that there should be continuous, actual occupation, to secure the land from forced sale. If the citizen or family should leave in search of another home, the first would remain until the second should be acquired. If a husband remove his wife and family into another county, and without providing them a home, abandon his wife, she might again resume possession of the homestead (*Fullerton vs. Boyle supra.*) And no absence, on pleasure or business, temporary in its nature, and not designed as an abandonment, would work a forfeiture of the right."

In *Walters vs. The People*, 18 *Ill. R.* 194, it was held that an absence, by reason of ill health, from the homestead for a year, by the widow, after the death of her husband, without any intention of abandonment, will not deprive her of the benefit of the homestead act. The court, by *Mr. Chief Justice Scates* said :

" It is contended here that the homestead was abandoned and lost, by the widow having rented the premises for some ten months, during which time she resided with her father, some six or eight miles distant, where her bad health, and approaching confinement required her to find that attention and care, that she could not obtain by remaining in the dwelling house of the homestead. What is the meaning of " occupy" or ' continuing to occupy,' within the meaning of the legislature? In common parlance, and in reference to house-keeping, we at once attach the idea of actual residence, dwelling, abiding on, the place of bed, board and washing, three acts of constant recurrence, to supply the necessaries of life, and renew the physical man. This is the second sense given it by Webster, but it is used also in the sense of possess, generally, and Webster also uses the word possess in the same variety of senses in the main as is given to occupy, or occupancy. Turn to 2 Bouvier's Law Dictionary 240, ' occupancy;' 336 ' possess,' and we find the words used and understood in the same great variety of senses. If a man go abroad, *animo revertendi*, and reside for temporary purposes of trade or business, he will not lose his domicil; and yet we know that the party's domicil follows his actual residence. So it is with foreign ministers and diplomatic agents. In contemplation of law they continue to occupy their mansions or dwellings in their own country, though actually resident abroad for years. A person may have a constructive possession or occupancy and he may have a *possessio pedis* by tenants, or actual enclosures, and in contemplation and within the meaning of law, he may have actual possession, actual occupation, without residence. Such is the difference between the statutes of limitation of 1835 and 1839. The object of a temporary absence here was the preservation of health, it may be also of life. The farm is made productive in the mean time, by renting, thus contributing to the end designed in a homestead—the support, in part, of the family. There was no intention of abandonment, as a constant anxiety was shown and expressed to do nothing to lose the right to the homestead as such. We shall put no such harsh

and narrow construction upon the language and intention of the legislature, as to take away the estate, when it becomes impolitic, or impracticable to continue to occupy by actual residence for a season—the possession—the occupation being preserved for the benefit of the family in the meantime, by a tenant, or by the storage of the household furniture, etc., until the family can return. The best intention of the legislature will> doubtless, be promoted, by allowing that continuing occupation of some of the family in the form and upon the terms best calculated to aid them in providing for their wants, whether by themselves or by their tenants. For it may be, at times, that food and clothing are paramount wants to shelter. At least for the purposes of this case, we find no forfeiture or abandonment, in the acts of the widow in proof here."

In *Cook et al. vs. McChristian*, 4 *California R.* 26, Mr. Chief Justice MURRAY, remarking upon the homestead act of California, said :

" The statute does not require any record of the selection of the homestead, and points out no mode in which the intention to dedicate property as a homestead shall be made known. In this particular, the statute is lame, and it will be observed, from reading the whole act, that the legislature, by accident, has omitted this necessary provision. In the absence of any statute regulating the subject, the filing of notice in the recorder's office of the county could have no legal verity, and would not be conclusive on purchasers or creditors. The homestead is the dwelling place of the family, where they permanently reside. By the common law, such residence would raise the presumption that the premises so held were the homestead, and every one would be bound to take notice of the character of the occupant's claim, as occupation is prima facie evidence of title. There is no dispute in this case that the plaintiffs knew of the defendants' possession. Such possession, taken in connection with other circumstances in the case, was properly submitted to the jury, from which to find the fact of the dedication of the premises as a homestead."

The homestead act of this State never having been before this court for construction until now, we have made the foregoing extracts for the purpose of showing the construction which the highest judicial tribunals of several of our sister States have placed upon similar acts, finding that these adjudications have some bearing upon the case before us.

It does not appear that the court below was asked to declare its opinion upon any matter of law, and we have only to determine whether there is any evidence to sustain the finding of the court, sitting as a jury.

We cannot say that there was a total want of evidence to sustain the finding that the appellee had, before the sale, dedicated a portion of the lands in dispute to the purposes of a *homestead*. He so declared when he put the premises in charge of a tenant, and went to the mill place to live; and he returned, with his wife, to the premises before the sale, and on the day of sale designated to the sheriff the particular portions of the lands that he claimed to be embraced in his *homestead*, and insisted that they were exempt from sale. It does not appear from the sheriff's return that he made any objection to the sale of the mill place, and it may have been the more valuable of the two places, for any thing that appears in the record. It was first struck off at $3000, and the bidder failing to comply with his bid, it was put up again and sold for $1,007, while the lands in dispute brought but $500, subject to the homestead claim ; and the evidence upon the trial conduces to prove that the rent of the premises was worth but little. Whether the appellee claimed the premises as a homestead before the sale in good faith, or as a mere pretence to defraud the creditor, was a question for the court, sitting as a jury, upon all of the facts and circumstances of the case. So it was the province of the court, sitting as a jury, to determine from the evidence, whether the place claimed as the *homestead* was the residence of the appellee, and whether his removal to the mill place was permanent, or merely temporary for business purposes—in other words, whether he had abandoned the homestead place as a residence, etc.

If he had a residence at the mill, and also a residence on the lands in dispute, and had not before the day of sale made his election of a *homestead*, under the act, we think he had the right to make his election on the day of sale, and that he was not bound to make it at the time the lands were levied on by the sheriff. See *Ross vs. Hannah*, 18 Ala. 127. Under the prevailing practice of levying on lands by simply procuring the numbers of them, and entering them upon the execution, a sheriff may make his levy without the knowledge of the defendant in the execution. By the terms of the law the homestead is exempt from *sale or execution*.

It is insisted for the appellant, that the appellee did not prove upon the trial that he was of the class of persons provided for by the act—that he may be a *negro, mulatto*, or *alien*, for any thing that was proven on the trial.

The proof shows that on the day of sale he claimed the benefit of the *homestead* act, and the sheriff so far recognized his right as to sell the lands subject to his homestead claim, if he had any. If he had been a negro or mulatto, it can hardly be supposed that the sheriff would have treated his claim with so much respect, for we must suppose that he knew that none but *white* persons were entitled to the benefit of the homestead act.

The evidence also conduces to prove that the appellee was the head of a family, and, by length of residence, a citizen of the State. The suggestion that he may be an *alien* comes with a bad grace from the appellant, as he claims title to the lands, which he seeks to recover in the action, through the appellee.

We cannot say that there was no evidence to sustain the finding of the court, in any material matter, and therefore affirm the judgment.