WAPELLO COUNTY v. PATRICK BRADY AND KATE BRADY Appellants.

Homestead: ABANDONMENT OF: ABSENCE. Whether absence from
1  a homestead shall be deemed abandonment depends upon the particular circumstances of each case.

Same: DECLINING TO SELL: EFFECT OF. Declining proposals to
2  purchase a former homestead are entirely consistent with a purpose to keep it for other purposes than a home.

Same: REMOVAL TO OTHER PROPERTY: PRESUMPTION. Where the
3  family removes to a place which may be claimed as a homestead, and occupies the same as such for any considerable length of time, the presumption arises that the former homestead has been abandoned, and convincing evidence must be adduced to overcome the presumption.

Same: CHOICE OF HOMES: NOT PERMITTED. The option of choosing
4  between two homes, when either is seized by creditors, is not permitted.

Same: ABANDONMENT: EVIDENCE OF. Evidence considered and
5  the former homestead held to have been abandoned.

*Appeal from Wapello District Court.*—HON. ROBERT SLOAN,
Judge.

WEDNESDAY, DECEMBER 17, 1902.

ACTION to subject property to the payment of a judg-
ment. The facts are disclosed in the opinion. Both parties
appeal, that of defendant being first perfected.—*Affirmed.*

*McNett & Tinsdale* and *Steck & Smith* for appellants.

*D. H. Emery,* County Attorney, *W. A. Work* and *A.
W. Enoch* for appellee.

LADD, C. J.—In January, 1885, Patrick Brady was
appointed by the board of supervisors of Wapello county
overseer of the poor in the city of Ottumwa, and continued
such until January, 1894. His salary was $5 per month,
and, among other things, he was authorized to furnish
temporary relief to transient persons without means and
transportation, to enable them to reach their legal settle-
ments, that they might not become charges on the county.
During the nine years of his incumbency he drew from the
county for these purposes $7,953.41. The disparity be-
tween the amounts requisite to effect these purposes by
his successor and those drawn from the county by Brady
aroused suspicion, and this action to recover a large portion
of that paid him, because of having been fraudulently ob-
tained, was begun February 24, 1894. The suit was aided
by a writ of attachment, levied on the real estate in con-
troversy. Judgment was rendered against him July 13,
1896, for $2,250 and costs. See, also, *State v. Brady,* 100
Iowa, 191.

The issues with respect to subjecting the real estate to
the payment of this judgment were not tried until August,
1900. All claim against the property of the son, John F.

Brady, was withdrawn, and the court found the evidence insufficient to trace any of the money wrongfully obtained from the county into the land owned by defendant's wife, Catherine Brady. It will be unnecessary to consider the correctness of this conclusion, as counsel concede the land in the judgment defendant's name ample to satisfy the debt. The court decreed that "the west end of outlot twenty-eight in the city of Ottumwa, Iowa, extending from Timber street, on the west end of said lot, to Washington street extended from the extension of Court north across the outlot," in the name of Patrick Brady, was subject to the lien of the judgment. This lot had been purchased by Brady in 1869. A one-story house, of five rooms, was constructed thereon in 1872, into which the family moved. Between 1875 and 1878 they lived elsewhere, but returned during the latter year, and remained until May, 1892. Some time previous Mrs. Brady had acquired lot six of outlot 25, across Timber street. On this lot was a house of eight rooms and a basement, and at the time mentioned the Bradys moved into it. The family was then composed of eight children all of whom were at home with the defendants; and the main reason for the change, as they agree, was to obtain more room. The old house was rented, but the barn and half the lot, on which Mrs. Brady kept her cows, was retained; also a couple of old stoves were left in the cellar. They moved back to the old house in November, 1894, because of the claim now asserted against the premises. The homestead character up to 1892 is conceded, and the only question to be determined is whether it ceased at any time prior to their return, in November, 1894. They frankly admit that their object in moving back was to protect their claim to the property as a homestead, and, of course, the inference necessarily follows that but for this they would have remained longer on lot six.

Whether absence from a homestead shall be deemed an abandonment, or to have been with *animus revertendi*,

depends on the facts of each particular case. Brady rented
the house continually during the absence.

1. HOMESTEAD: abandonment of: absence. This is a circumstance tending to show aban-
donment (*Painter v. Steffen*, 87 Iowa, 177, and
*Fyffe v. Beers*, 18 Iowa, 4,) but is not necessarily incon-
sistent with an intention to return (*Zwick v. Johns*, 89
Iowa, 552; *Boot v. Brewster*, 75 Iowa, 631). Again con-
siderable significance is given to the retention of a room or
leaving furniture in the house in many of the decisions.
*Repenn v. Davis*, 72 Iowa, 548; *Shirland v. Bank*, 65
Iowa, 96; *Benbow v. Bover*, 89 Iowa, 496; *Reeseman v.
Davenport*, 96 Iowa, 332; *Robinson v. Charleton*, 104 Iowa,
298; *Lumber Co. v. Atkins*, 116 Iowa, 242. In all these,
however, the owner was so situated as that such retention
tended to show a purpose of making use of the whole again.
But the defendants occupied the barn and part of the lot
in controversy in connection with the premises immediately
across the thirty-five foot alley or street on which they
lived, and not in a way different from what would have
been likely of any property not claimed as a homestead
owned by either of them. Such occupancy harmonizes
quite as well with an intention to retain lot six as a home
as with that of returning to the old one. While offers for
sale indicate a purpose of abandonment (*Dunton v. Wood-
bury*, 24 Iowa, 77), they cannot always be regarded as
conclusive.

But the inference from such evidence, as bearing on
the question of intent, is much stronger than declining
proposals to purchase, for the latter are entirely consistent

2. SAME: de-clining to sell: effect of. with a purpose to keep with some other object
in view than occupancy as a home. See *Fyffe v.
Beers, supra*, and *Robinson v. Charleton, supra*.
The bare refusals of the Bradys to negotiate for the dis-
posal of the property was of no significance, as the evi-
dence shows without dispute that it was yielding a fair
rental, that Mrs. Brady had been acquiring property as an

investment, and that their situation was such as to render its retention for purposes other than a home desirable. Every act relating to this house and lot in controversy subsequent to removal therefrom in 1892 is absolutely consistent with the claim that it was abandoned, and also with the occupancy of lot six as a homestead. Lot six was in the name of Mrs. Brady, and might be treated as the homestead of the family. Section 2972 of the Code. Occupancy of other property which could be claimed as a homestead was said in *Ayers v. Grill,* 85 Iowa, 720, to be "a strong circumstance tending to show an' abandonment of the homestead in land." .There, though the claimant had bought a house in Dewitt, in which he resided six months, he had paid nothing on it; and the evidence showed, by a clear preponderance, an intention not to abandon the homestead.

In *Davis v. Kelley,* 14 Iowa, 523, the defendant occupied a house in Waterloo as his homestead until the summer of 1858, and then moved to his farm, twelve miles 3. SAME: removal to other property: presumption. distant, where he remained until March, 1860, when he went to Dubuque, and came back to Waterloo in June of the same year, but not into his house, as it was rented, until September. After his removal to the farm, Kelley executed a mortgage on the house in which his wife did not join, and, in defense to an action of foreclosure thereon, set up this fact, and that the property was the homestead of the family, as invalidating the mortgage. In holding that he. had abandoned the house as a homestead, the court said: "The husband had left the premises and moved his family to the farm. He had not gone there for pleasure, nor to accomplish mere temporary business purposes, but to make it his home. True, he swears that at the time he regarded the premises mortgaged as his homestead. But this is not the test. The question is whether he did not by his act abandon the old, and acquire a new, homestead. If so,

the former right was terminated, for he could have but one homestead at the same time. It is not as though he had left in search of another home, which he never acquired. For he was at the time settled upon his farm, and this to him, then, had all the essential legal attributes of a homestead. His search was at an end. * * *. When other premises are used and occupied by the family as their home the intention to abandon the former homestead is quite clearly and conclusively established."

In several cases, that property suited for a home has not been acquired is mentioned as of controlling importance. *Fyffe v. Beers*, 18 Iowa, 4; *Robinson v. Charleton*, 104 Iowa, 296; *Painter v. Steffen*, 87 Iowa, 171; *Boot v. Brewster*, 75 Iowa, 631. In the first of the above cases the house in town was neither bought for, or ever occupied as, a home. Where the removal is to a place which may be claimed as the homestead, and which is occupied in all respects as though it were such for a considerable length of time, the presumption should be indulged that it is precisely what, to all outward appearances, it seems to be. The protection of the family is generally conserved by regarding the dwelling occupied as exempt to the exclusion of that previously occupied. Wapples, Homestead, section 567. If everything is done that can characterize it as such, clear and convincing evidence must be adduced to overcome the presumption that it is what it appears. See *Jarvais v. Moe*, 38 Wis. 440; *Wolf v. Hawkins*, 60 Ark. 262 (29 S. W. Rep. 892). Of course, the presumption cannot be regarded as conclusive, but subject to a satisfactory explanation that the new residence was intended as temporary, and the former home not abandoned. *Tomlinson v. Swinney*, 22 Ark. 400 (76 Am. Dec. 432); *Robinson v. Swearingen*, 55 Ark. 55 (17 S. W. Rep. 365); *Reistein v. Daniels*, 75 Tex. 640 (13 S. W. Rep. 21); *Ayres v. Grill, supra.* But a vague intention to return at some future time will not suffice. *In re Phelan's Estate*,

16 Wis. 76; *Jarvais v. Moe, supra.* Nor will the design to return only in event of certain contingencies. *Lumber Co. v. Atkins,* 116 Iowa, 242; *Conway v. Nichols,* 106 Iowa, 359; *Kimball v. Wilson,* 59 Iowa, 638.

In no case can the option in choosing between two homes, when either is seized by creditors, be retained. One or the other must be shown to have that character prior thereto. The evidence in the case at bar did not overcome the presumption to which we have referred, and, as the court's finding is challenged with much confidence, the reasons for our conclusion may be briefly stated: The testimony of Patrick Brady should be rejected as unworthy of belief. The judgment sought to be enforced is based on an indebtedness to the county for the money obtained by falsely representing under oath a great number of times that he had expended money for transporting and feeding indigent persons. No argument is needed to justify a court in refusing to extend credit to a person condemned as a perjurer by its own judgment in the very suit being heard. Mrs. Brady testified the change was made in order to obtain more room. It will be remembered that there were ten in the family, and five rooms in the old house, and eight in that to which they moved. To quote her words: "We thought we would move over there until we got our debts paid, and get a little money ahead to fix the property so we could have room in it. * * * We talked about it in the family some time before we moved, and we decided to move for a year or so, until we could either repair or build on the homestead." But the last of Mrs. Brady's debts were discharged in December, 1892; and though her income continued unabated until June, 1893, at least, and thereafter, though without the aid of her son, was augmented by rents and the salary of her daughter, nothing whatever was done toward improving the old house. She had kept cows for many years,

4. SAME: choice of homes: not permitted.

5. SAME: abandonment: evidence of.

and, by the sale of increase and of milk, had not only
clothed the family, but had paid off the $500 mortgage on
the house in 1882, and subsequently accumulated $900
more, with which, and money borrowed, she had pur-
chased an adjoining lot, on which there was a double
house, for $1,025, in 1889. In February, 1891, she, with
two sisters, bought a forty-acre tract of land for $2,400,
all of which was paid by July 10th. In December of the
same year she bought lot six for $2,050, paying $900 in
cash, and executing a mortgage for the balance in semi-
annual payments; the last becoming due February 1, 1894.
This mortgage was satisfied in 1892. This property had
been rented, which fact explains why the family did not
move in until May following. Mrs. Brady accounts for
this rapid accumulation of property by saying that her
son, who was earning about $100 per month during the
period of these purchases, turned over much of what he
received to her. Her income from the cows had been
greatly reduced, as she no longer kept more than two;
and her daughter could not have been of aid, as she first
began teaching in the fall of 1892. In view of her situa-
tion, even though the explanation be accepted, her pros-
perity was such as might well surprise the husband and
excite his admiration, although not contributing a penny
of his ill-gotten gain. With a rent roll of about $25 per
month, still selling milk, her daughter's salary as school-
teacher, and her son's income up to June, 1893, to say
nothing of what Brady was obtaining from the county,
why did she not improve the old home, as she testified they
intended? The showing which became necessary to meet
the charge that money obtained by Brady from the county
had not gone into the property bought demonstrates that
the pretense that the former home was to be improved,
and this was foregone because of want of means, ought
not to be given credit. It may well be regarded as a
subterfuge resorted to for the purpose of explaining the

change of residence, in order to shield the property in controversy from the claim of the county. It may be that the children heard their parents speak of some time going back. Probably they talked of returning, and may have had a vague notion of doing so in the future. This is all the proofs of conversations by others, with the Bradys tend to show. But an indefinite purpose to improve the property at some future time, and only to return to it in event this should be accomplished, ought not to be allowed to overthrow the presumption clearly manifested by the selection and long occupancy of another home. Such evidence is entirely consistent with the conclusion that lot six was occupied as a homestead, but that the family intended at some future time to acquire another by moving to the old place, when made suitable for their purposes. When only verbal evidence of the *animus revertendi* is relied upon in such a case, the temptation open to the witnesses interested is such as to call for careful scrutiny. Here they were before the trial court, with better advantages for testing their credibility than we possess, and we are inclined to attach considerable weight to its judgment. See *Flynn v. Riley* (Neb.) 83 N. W. Rep. 663; *Earll v. Earll*, 60 Mich. 30 (26 N. W. Rep. 823).—AFFIRMED.